UNITED STATES DISTRICT COURT                    <u>For Online Publication Only</u>
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
TRACY R. SAMUELS,

                              Plaintiff,        <u>**MEMORANDUM AND ORDER**</u>

 - against -                                    19-cv-6943 (JMA) (ST)

ST. CHARLES HOSPITAL AND
REHABILITATION CENTER, ANN MARIE                            **FILED**
MILLER, in her official capacity, NICOLLETI                 **CLERK**
FIORE-LOPEZ, in her official and individual
capacity, SUSAN COLUCCI, in her official        4:19 pm, Sep 30, 2022
and individual capacity, and MARY ELLEN
CHEVALLIER, in her official and individual         **U.S. DISTRICT COURT**
capacity,                                       **EASTERN DISTRICT OF NEW YORK**
                                                    **LONG ISLAND OFFICE**
                              Defendants.
-------------------------------------------------------------X

**APPEARANCES**

**LAW OFFICES OF FREDERICK K. BREWINGTON**
Attorneys for Plaintiff
556 Peninsula Boulevard
Hempstead, NY 11550
By:    Frederick K. Brewington, Esq.

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
Attorneys for Defendants
30 Rockefeller Plaza
New York, NY 10112
By:    Kevin J. Smith, Esq.

**AZRACK, District Judge:**

## INTRODUCTION

Plaintiff Tracy R. Samuels ("Samuels") brought this employment

discrimination action against Defendants St. Charles Hospital and Rehabilitation

Center ("St. Charles"), Ann Marie Miller ("Miller"), Nicolleti Fiore-Lopez ("Fiore-

Lopez"), Susan Colucci ("Colucci"), and Mary Ellen Chevallier pursuant to the 42 U.S.C. § 1981, alleging that Defendants discriminated against her on the basis of race. Samuels asserts three 42 U.S.C. § 1981 claims: race discrimination, hostile work environment, and retaliation.

Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 seeking to dismiss Plaintiff's case in its entirety. For the reasons below, Defendants' motion is granted.

## BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 Statements and the evidence cited in support thereof. (Defs. Local Rule 56.1 Statement ("Def. 56.1") [DE 52-1]; Pl. Local Rule 56.1 Response Statement ("Pl. 56.1 Resp.") [DE 53-1]; Defs. Local Rule 56.1 Response Statement ("Def. 56.1 Resp.") [DE 54-4]).

Samuels, an African American/Latin American Black woman, worked as a certified nursing assistant ("CNA") in St. Charles's maternity ward until she decided to get an Associate's Degree and become a registered nurse (an "RN"). (Def. 56.1 ¶¶ 6–7; Pl. 56.1 Resp. ¶ 56). Upon graduating and obtaining her New York State nursing license, she applied to an open RN position with the St. Charles telemetry unit's night shift. (Def. 56.1 ¶ 8). On October 27, 2016, Samuels was hired, contingent upon her satisfactory completion of a three-month probationary period, which consisted of a classroom component and a clinical component. (*Id.* ¶¶ 10, 12–13; Ltr. dated Oct. 27, 2016, Ex. 7 [DE 52-10] to Declaration of Kevin J. Smith ("Smith Decl.") [DE 52-3]). As explained infra, Samuels' probationary period was extended in

January 2017 due to performance issues and Samuels was ultimately terminated on March 16, 2017 while still in her probationary period.

Peter Paniagua—the nurse educator at St. Charles—oversaw Samuels' probationary period. (Def. 56.1 ¶ 14; Tr. of Deposition of Tracy Samuels ("Samuels Dep.") at 282–83, Ex. B [DE 53-4] to Declaration of Frederick Brewington ("Brewington Decl.") [DE 53-2]).

## A. December 2016 – Clinical Component of Samuel's Orientation Begins

After she completed the probationary period's classroom component without incident in early December 2016, Samuels began her clinical component with Colucci—a white woman—as her assigned preceptor. (*Id.* ¶¶ 15–16; Pl. 56.1 Resp. ¶¶ 64–65). Almost immediately, Colucci noted deficiencies in Samuels' job performance and, as part of the probationary process, held meetings with Paniagua, Samuels, and sometimes Samuels' manager Miller, to address them. (Def. 56.1 ¶¶ 10, 17, 19, 21; Pl. 56.1 Resp. ¶¶ 65, 68).

For example, on December 21, 2016, Colucci sent Paniagua an email with a litany of issues with Samuels' work performance. (Email dated Dec. 21, 2016 ("Dec. 21, 2016 Email"), Ex. 2 [DE 52-20] to Declaration of Peter Paniagua ("Paniagua Decl.") [DE 52-18]; *see* Tr. of Deposition of Susan Colucci ("Colucci Dep.") at 93–109 (discussing same), Ex. F [DE 53-8] to Brewington Decl.). Colucci listed many of the same problems for which Samuels would ultimately be terminated: "trouble grasping time frame and priority of tasks, ex: meds are due at a certain time"; "struggling to be competent in using IV pumps and giving IV meds"; "struggl[ing] to be aware of the

possibilities of new orders during the course of the day, and the need to act upon such orders in a timely fashion."  (Dec. 21, 2016 Email; Colucci Dep. at 93–109).

On December 27, 2016, Samuels received and signed the first of her two "Orientation Contracts," each of which laid out several goals for her to meet.  (*See* Orientation Contract dated Dec. 27, 2016, Ex. 3 [DE 52-21] to Paniagua Decl.).  These goals pertained to the deficiencies noted earlier.

Samuels' first Orientation Contacts required her to, among other things, "provide <u>independent</u> care of 3 medical patients, including safe medication administration" and "giv[e] an organized, comprehensive, [and] detailed report" about the patients she handled.  (*Id.* (emphasis in original)).

During a meeting that same day about the Orientation Contract, Samuels was reminded that, each week, she is supposed to add one patient to her responsibilities. (Paniagua Decl, Ex. 1 ("Paniagua Notes") at SCF00118).  However, it was reported to Paniagua that, for the past three weeks, Samuels had only been caring for one patient.[1]  (*Id.* at SCF00118, SCH00123).  At her deposition, Samuels testified that she never cared for only one patient during her orientation.  (Samuels Dep. at 194.).

---

[1] Samuels asserts, without further elaboration, that Paniagua's notes are inadmissible.  (*See* Pl. 56.1 Resp. ¶ 18.)  The Court disagrees.  First, these notes may be offered to "to demonstrate that Plaintiff's supervisors received complaints about Plaintiff's behavior and conduct."  *Wolf v. Time Warner, Inc.*, 2012 WL 4336232, at *7 (S.D.N.Y. Sept. 17, 2012) (Sullivan, J.), *aff'd*, 548 Fed. App'x 693 (2d Cir. 2013).  Second, these notes are admissible as business records.  (*See* Paniagua Decl. ¶10) (stating that it was his regular practice to take notes of his interactions and conversations with orientees and preceptors).  Moreover, Paniagua submitted a declaration recounting many of the same facts that are set out in his notes.

**B.  January 2017**

In mid-January 2017, Samuels complained to Paniagua about Colucci—specifically, that "Colucci did not want to be bothered precepting" her—and requested that Paniagua assign her a new preceptor.  (Pl. 56.1 Resp. ¶ 69; "Samuels Dep. at 90:11–92:14 ).  Paniagua initially resisted her request but, ultimately, Samuels was reassigned to Chevallier, another white woman.  (Pl. 56.1 Resp. ¶¶ 69–70).

Like Colucci, Chevallier reported problems with the way Samuels performed her duties.  (Pl. 56.1 Resp. ¶¶ 70–73).  For example, Chevallier criticized Samuels' late administration of medication to patients, her "dangerous and inappropriate" practice of taping medications to a piece of paper, and her repeated failure to finish her daily paperwork.[2]  (Def. 56.1 ¶ 32; Pl. 56.1 Rep. ¶¶ 71, 73).

Soon after Chevallier was assigned as her preceptor, Samuels reached out to a representative of a union—the New York State Nursing Association, a union to which Samuels did not belong—regarding the way Chevallier yelled at her and treated her like a child.  (Pl. 56.1 Resp. ¶¶ 77–79; Samuels Dep. at 102:12–108:8).  Samuels, however, did not complain to the union representative about discrimination.

---

[2] At her deposition, Chevallier testified that she told Paniagua that Samuels was not open to being taught or open to helpful suggestions.  (Chevallier Dep. at 43–46.)  As an example of this behavior, Chevallier cited Samuel's practice of taping medications to a piece of paper.  (*Id.* at 44).  Chevallier explained to Samuels why this practice was dangerous and showed her a safer way to manage the patients' medications.  (*Id.* at 44–45).  However, the next time Chevallier worked with Samuels, she continued her prior practice of taping the medications to a piece of paper.  (*Id.* at 45).  Chevallier acknowledged that, "eventually," Samuels adopted Chevallier's suggested method for handling the medications.  (*Id.* at 46).  Samuels' papers seize on this testimony in an attempt to show that, in fact, Samuels was open to learning.  However, this testimony—which plaintiff does not dispute—is much more damaging to Samuels than it is helpful.

Around this time, Samuels also advised Paniagua and Miller that she was speaking to the union about the way she was being treated. (Samuels Dep. at 101–03). Samuels, however, did not tell Paniagua or Miller that she had complained to the union representative about discrimination.

Samuels admits that, at no point, did she ever hear Colucci, Chevallier, Paniagua or Miller say anything racially discriminatory. (Samuels Dep. at 102:12–108:8).

On January 27, 2017, having received further reports from Chevallier that Samuels' job performance not improving, Paniagua gave Samuels a second Orientation Contract and extended her probationary period. (*See* Def. 56.1 ¶¶ 28–30; Paniagua Decl. ¶ 18; Tr. of Dep. of Nicolleti Fiore-Lopez ("Fiore-Lopez Dep.") at 56:4–14, Ex. E [DE 53-7] to Brewington Decl.).

Chevallier reported to Paniagua that, as of January 27, Samuels continued to have difficulties with time management, failed to complete patient documentation in a timely manner, and was unable to manage the care of five patients.[3] (Defs. 56.1 ¶ 26; *see also* SCH00124–0012). Chevallier reported that Samuels had failed to

---

[3] Samuels insists that, as of January 27, she was already able to manage eight to ten patients independently and, thus, suggests that Chevallier lied to Paniagua about her patient load. (Samuels Dep. at 226). However, Chevallier's report that Samuels was unable to successfully manage five patients was consistent with reports that Paniagua had received earlier in January from another preceptor, Lindsay Gueli, who supervised Samuels for a few days in mid-January before Chevallier became Samuels' preceptor. (Paniagua Notes at SCH00123). Gueli reported to Paniagua on January 12, 2017, that Samuels was generally doing well, but was only able to handle four patients because she was overwhelmed with five patients. (*Id.* at SCH00124). The next week, Gueli again reported Samuels was still only able to care for four patients. (*Id.*). For that week, Samuels was supposed to care for five patients independently—a goal she failed to meet. (Paniagua Decl. ¶ 14). Because Samuels had, by this time, shown the ability to handle four patients, she was encouraged to take on five patients on January 19. (Paniagua Notes at SCH00124). However, as noted above, Chevallier informed Paniagua on January 27 that Samuels was still unable to handle five patients.

administer time-critical medications to one patient and Samuels still needed assistance identifying patient priorities, reminders to check physician orders in a timely manner. (*Id.*). Chevallier also reported that plaintiff was deficient in relaying necessary information to "her relief" on the next shift.[4] (*Id.*).

On January 27, Samuels received and signed her second "Orientation Contract," which reiterated and expanded upon the goals in the first contract. For example, it indicated that she was to "provide <u>independent</u> care of 6 medical patients, including safe medication administration" and "prioritize nursing care and interventions utilizing critical thinking skills considering time critical medications." (Orientation Contract dated Jan. 27, 2017 (emphasis in original), Ex. 4 [DE 52-22] to Paniagua Decl.).

## C. February and March 2017

In February 2017, Samuels met with Fiore-Lopez—the Chief Nursing Supervisor—who had learned from Miller that Samuels was speaking to union representatives. (Samuels Dep. at 144:18–146:11; Colucci Dep. at 23). According to

---

[4] In Samuels's 56.1 statement she asserts, in conclusory fashion, that she "disputes and objects" to paragraph 26 of Defendants' 56.1 statement, which recounts Chevallier's report of Samuels's poor performance. (Pl. 56.1 ¶ 26.). However, the only evidence she cites is her deposition testimony in which she asserted that she was unable to perform all of her duties and responsibilities because she was constantly being interrupted by Defendants who made her attend meetings. (Pl. 56.1 ¶ 26; *see* Samuels Dep. at 187 ("We had a lot of meetings. They interrupted me a lot during my working period, pulling me into an office to sit and talk for an hour."). At one her point in her deposition, Samuels was confronted with a document in which she admitted that she had difficulties completing patient charts in a timely fashion. (Samuels Dep. at 209.). Samuels sought to excuse her deficient performance by claiming that she was unable to complete the patient documentation because "was constantly interrupted by" the meetings she was required to attend at least once a week. (*Id.*). These meetings would last between sixty and ninety minutes each. (*Id.*) This is a recurring theme in Samuels's opposition papers: she attempts to excuse her performance by claiming that these meetings prevented her from meeting her goals and responsibilities. Moreover, Samuels does not offer any evidence which contradicts Chevallier's report that Samuels needed reminders to check physician orders in a timely manner and was deficient in relaying necessary information to "her relief" on the next shift.

Samuels, Fiore-Lopez yelled at her, threatened her career, and gave her two weeks to "shape up." (Samuels Dep. at 144:18–146:11; *see* Pl. 56.1 Resp. ¶ 81). At no point did Fiore-Lopez or anyone else say anything racially discriminatory. (Samuels Dep. at 144:18–146:11).

According to Paniagua, in early February, Chevallier reported that Samuels was unable to complete her required documentation in a timely manner. (Defs. 56.1 ¶ 34). Chevallier also advised Paniagua of other performance issues and informed him that Samuels was not ready to transition to the night shift because she required continued oversight, redirection, and reminders about how to effectively prioritize care.[5] (Pls. 56.1 ¶¶ 31, 34).

On February 16, 2017 and February 23, 2017, Chevallier told Paniagua that Samuels was generally doing well and was improving in certain areas. (Paniagua Notes at SCH00132). At this point, she was able to handle five patients and was given the goal of taking six patients on by the end of February.[6] (*Id.*).

On February 27, 2016, Paniagua spoke with "Tammy," a nurse who precepted Samuels for one day. (Paniagua Notes at SCH00132). Tammy reported to Paniagua

---

[5] In her 56.1 statement, Samuels disputes Chevallier's reports of her deficient performance set out in paragraph 34 of Defendants' 56.1 statement. In support of this assertion, Samuels cites to a single line of testimony from her deposition in which she claimed, in conclusory fashion, that she would get her "work" "done" and that her patients would get their "all their meds and their treatments." (Samuels Dep. at 211). Samuels asserts that the only time this did not occur was when she was interrupted to attend meetings. (*Id.*; Pl. 56.1 ¶ 34). Again, Samuels seeks to rationalize and excuse the deficient performance reported by her preceptors. Notably, there is no evidence in the record that Samuels was required to attend more meetings than the other orientees who were able to pass their probation. Moreover, the conclusory snippet of testimony cited by Samuels does not even dispute Chevallier's reports that she needed continued oversight, redirection and reminders.

[6] As noted earlier, one of the goals that had been set for Samuels at the end of January was for her to care for six patients independently by the first week of February.

that she also had issues with Samuels following directions and needing prompting. (*Id.*). According to the notes, Tammy told Paniagua that she could see how other preceptors were having a difficult time with Samuels. [7] (*Id.*).

On March 6, 2016, Chevallier reported to Paniagua that Samuels was still having issues prioritizing matters and is not open to criticism. (Paniagua Notes at SCH00133). Chevallier also reported two specific instances where Samuels' conduct jeopardized patient safety. (*Id.*) Chevallier subsequently reported two additional occasions where Samuel jeopardized patient safety. Each of these four incidents are discussed infra.

**D. Samuels' March 16 Termination**

As a result of Samuels' inability to complete her probationary period to Defendants' satisfaction and her recent patient safety issues, Miller, Fiore-Lopez and the St. Charles's Vice President of Human Resources agreed to terminate Samuels' employment. (Def. 56.1 ¶¶ 38–39; Pl. 56.1 Resp. ¶¶ 83–84). On March 16, the three held a termination meeting with Samuels and presented her with a detailed Termination Notice which stated that "[d]espite additional precepting, training and education, [Samuels'] performance continues to be unsatisfactory" and recounted in detail the four incidents from March referenced above that threatened patient safety. (Def. 56.1 ¶¶ 40–41; Employee Termination Notice ("Termination Not."), Ex. I [DE

---

[7] At her deposition, Samuels testified that, on this day, Tammy came in almost an hour late for work and then was on "break." (Samuels Dep. at 284). Samuels maintained that she did not see Tammy for the entire 11-hour shift. (*Id.* at 285). Samuels insists that, on this shift she cared for patients without any supervision from Tammy or anyone else. (*Id.* at 285–86). While Samuels appears to contest the veracity of Tammy's report to Paniagua, a jury could not find, based on Samuels' deposition testimony, that this report was not made to Paniagua.

53-11] to Brewington Decl.).  Samuels refused to sign the Termination Notice.  (Pl. 56.1 Resp. ¶ 84).

During the March 16 meeting, Samuels informed Defendants, for the first time, that she believed they were mistreating her because of the color of her skin and that she was "being discriminated against."[8]  (Samuels Dep. at 69, 90–92, 108–109; *see* Pl. 56.1 Resp. ¶¶ 86, 88).  Samuels also insisted that Defendants were treating her with hostility, and retaliating against her, as a result of her communicating with the union.  (Pl. 56.1 Resp. ¶ 43; Samuels Dep. at 101–102, 208).

According to an email from Maureen Morris to Miller and Fiore-Lopez, after the March 16 meeting, Samuels called Morris later that day and asked if she could resign in lieu of termination.  According to this email, on this phone call, Samuels offered excuses for two of the safety incidents that led to her termination.  Those excuses are discussed <u>infra</u>.

---

[8] During the clinical portion of her orientation period, Samuels told three CNAs that she believed she was being mistreated and discriminated against.  On one occasion, she told a CNA named Debbie Raffo that she felt was being "discriminated" against.  (Samuels Dep. at 73, 82).  At her deposition, Samuels admitted that this statement about discrimination to Raffo occurred during a conversation with Raffo and that Samuels did not consider this to be a "complaint."  (*Id.* at 82).  In another incident, Samuels and another CNA both discussed how they believed that Samuels was being discriminated against.  (*Id.* at 75–80, 86, 93).  In the third incident, Samuels told a male CNA that she felt she was being discriminated against.  (*Id.* at 87).  There is no evidence suggesting that any of these discussions about discrimination between Samuels and CNAs were relayed to any other people, including Samuels's superiors.

While Samuels initially testified that she also complained about discrimination to a registered nurse, when this issue was probed at her deposition, Samuels admitted that discrimination was not mentioned during this conversation.  Rather, Samuels admitted that, during this conversation, the registered nurse simply told Samuels that she was being mistreated, but neither Samuels nor the registered nurse mentioned discrimination.  (*Id.* at 89).

After the meeting, Defendants notified the New York State Office of Professional Development ("OPD") of Samuels' termination pursuant to New York State Public Health Law § 2803-e(1)(a).  (Def. 56.1 ¶ 45).

**E.  Four Incidents in the Termination Notice that Threatened Patient Safety**

    **1.  March 3 Incident Concerning Heparin**

According to Chevallier, on March 3, Samuels delayed roughly two hours in starting a Heparin drip for a patient who needed it to salvage a limb.  (Pl. 56.1 Resp. ¶ 74; Termination Not.; Tr. of Dep. of Mary Ellen Chevallier ("Chevallier Dep.") at 36:19–38:7, Ex. G [DE 53-9] to Brewington Decl.; Emails dated March 16, 2017, Ex. M [DE 53-15] to Brewington Decl.).  An hour after Samuels was given this assignment, the drip had still not been started.  (Termination Not.).  According to Chevallier, when she questioned Samuels, Samuels said that she was waiting for the heparin bag.  (*Id.*).  However, the bag was already hanging in the patient's room.  (*Id.*).  Chevallier reported that Samuels failed to recognize the importance of trying to salvage the limb, had no sense of urgency, and needed prompting and assistance to restart the drip.  (*Id.*; Paniagua Notes at SCH00133).

According to Morris's March 16 email, Samuels tried to justify her conduct concerning the Heparin, telling Morris that "she had never done a Heparin drip before, and she hung the drip alone with" Chevallier.  (Emails dated March 16, 2017). Samuels does not dispute that she relayed this justification and excuse to Morris on March 16.

At her deposition in 2020, Samuels disputed that she lacked a sense of urgency during this incident, insisted that she did not need prompting to give this medication,

and generally asserted that Chevallier was lying about the heparin incident. (Samuels Dep. at 288). Samuels, however, has not provided her version of how this incident transpired.

## 2. March 4 Incident Concerning Lithium

According to Chevallier, on March 4, she had to remind Samuels three times over the course of four hours to give a patient lithium, an antipsychotic drug, as soon as possible. (Def. 56.1 ¶ 36; Termination Not.; Chevallier Dep. at 35:11–25). When Chevallier reminded Samuels again after an hour had passed that this medicine was due, Samuels responded that she knew about the lithium, but "had a lot going on." (Paniagua Notes at SCH00133). At her deposition, Samuels asserted, without further elaboration, that Chevallier was "lying" about the incident involving the lithium. (Samuels Dep. at 289). Again, Samuels has not provided her version of how this incident transpired.

## 3. March 7 Incident Concerning Lasix

Chevallier reported that, on March 7, Samuels took two hours to restart a Lasix drip for a patient with acute renal failure and only did so after being given two reminders by Chevallier. (Termination Not.) According to Chevallier, Samuels responded by telling her that distribution of pain medication takes priority. (*Id.*).

As recounted in Morris's March 16 email, Samuels offered two excuses for her conduct concerning the Lasix drip. (Emails dated March 16, 2017). First, Samuels told Morris she forgot to do the Lasix drip because she had two detox patients who were acting up. (*Id.*) Second, Samuels quibbled with Chevallier's account of Samuels' statement about the priority of pain medication, insisting that she had actually told

Chevallier, "Didn't you tell me that pain medication takes priority [over other medication]?" (*Id.*).  At her deposition, Samuels did not dispute Morris's account of their March 16 conversation and did not address the Lasix incident in any fashion.

### 4.  March 13 Incident Concerning Heart Medication

According to Chevallier, on March 13, Samuels failed to adhere to a doctor's order to give a patient heart-rate medication "right away" and took over an hour to administer it. (Def. 56.1 ¶ 37; Termination Not.).  Samuels' deposition testimony does not contradict Chevallier's account of this incident.  At her deposition, Samuels could not recall how long, after the doctor's initial order, it took her to give the patient the medication or other details about this incident.  (Samuels Dep. at 304).  At the deposition, Samuels tried to excuse her failure to give this medicine immediately, claiming that the problem was that she had eight or nine patients that day and was very busy and Chevallier was not helping her at all.  (Samuels Dep. at 303).  According to Samuels, instead of helping her, Chevallier was sitting at the front desk, talking to the doctors, and "having a party." (Samuels Dep. at 303).

### 5.  Reporting of these Incidents in the MIDAS system

St. Charles has an internal reporting system, known as MIDAS.  Incidents involving patient safety are supposed to reported in MIDAS so the hospital can review these incidents to prevent them in the future.  (Fiore-Lopez Dep. at 105–08.)  On the morning of March 16, while Samuels' termination notice was being drafted, Miller directed Paniagua to work with Chevallier to identify the patients who were involved in these incidents and to enter these incidents into the MIDAS system, days after the incidents occurred.  (Pl. Ex. L.)

Samuels asserts that, because these incidents were not immediately entered into the MIDAS system that a jury could question the veracity of Chevallier's reports of these four incidents as well as some of her earlier reports to Paniagua involving patient safety issues that were, apparently, also not reported in the MIDAS system. This evidence is not sufficient for a jury to infer that the incidents at issue did not occur or were not believed to be serious at the time. Colluci's December 21, 2016 email and Paniagua's extensive notes indicate that Chevallier and other preceptors reported issues with Samuels performance to him throughout Samuels' orientation period, including some of the incidents set out in the Termination Notice.

## LEGAL STANDARD

Summary judgment, pursuant to Rule 56, is appropriate only where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When making this determination, a court must view all facts "in the light most favorable" to the non-movant, *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014), and "resolve all ambiguities and draw all permissible factual inferences in favor of the [non-movant]," *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). Thus, "[s]ummary judgment is appropriate [only] where the record taken as a whole could not lead a rational trier

of fact to find for the [non-movant]." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts demonstrating that there is a genuine dispute of material fact to be tried. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-movant must present more than a "scintilla of evidence," *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita*, 475 U.S. at 586–87), and "may not rely on conclusory allegations or unsubstantiated speculation," *id.* (quoting *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination[s] of summary judgment motions," *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the [non-movant] will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by pointing to an absence of evidence to support an essential element of the [non-movant's] case." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (quoting *Brady*, 863 F.2d at 210–11) (internal quotation marks omitted).

Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). "[A] complete failure of proof concerning an essential element of the [non-movant's] case necessarily renders all other facts immaterial." *Crawford*, 758 F.3d at 486 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

The Court addresses Plaintiff's three claims in the following order: (I) race discrimination, (II) hostile work environment, and (III) retaliation.

## I.      Race Discrimination

Section 1981 claims alleging race discrimination are analyzed "under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (parallel reporters omitted). The first stage places the burden on a plaintiff to establish a *prima facie* case; namely, that (1) she is a member of a protected class; (2) she was qualified for the position she held or was performing her job duties satisfactorily; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination. *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010); *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

The Court assumes *arguendo* that Samuels has established a prima facie case.[9] Once plaintiff establishes a prima facie case, "the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for the" adverse employment action. *Ruiz*, 609 F.3d at 492. Then the burden shifts back to the plaintiff to show pretext – *i.e.*, that the real reason for the adverse action was her race. *Id.*

"[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000). "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason" for the employer's decision. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

A plaintiff "may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." *Reeves*, 530 U.S. at 143; *see also Taylor v. Family Residences and*

---

[9] Defendant argues that because Plaintiff was incapable of performing her responsibilities during her probationary period, she cannot establish, for purposes of her prima facie case, that she was qualified for the registered nurse position. This argument has some merit. For example, in *McLee v. Chrysler Corp.*, the Second Circuit affirmed a grant of summary judgment on the plaintiff's discrimination claim because his employer's evaluations after his first 30 and 120 days on the job found that his "performance was not satisfactory." 109 F.3d 130, 135 (2d Cir. 1997). In those negative evaluations, the employer specifically noted the plaintiff's "deficien[cies] in 13 of the 22 areas in which he was rated." *Id.* The plaintiff in *McLee* tried to argue that his employer was partly responsible for his performance, but the Second Circuit deemed his arguments to be "rationalizations for his deficiencies rather than demonstrations of any genuine issue of material fact to be tried," which only "confirm[ed] the validity of the [] criticisms." *Id.* Like the plaintiff in *McLee*, Samuels has offered rationalizations for many of the performance deficiencies reported by her preceptors. As such, Samuels' claim may fail at the prima facie stage. *See also Henry v. McDonald*, 531 F. Supp. 3d 573 (E.D.N.Y. 2021). However, in abundance of caution, the Court has assumed that Samuels established a prima facie case as it is easier to resolve this case on the questions of pretext and whether plaintiff can ultimately establish that her race was motivating factor in her termination.

*Essential Enters., Inc.*, No. 03-CV-6122, 2008 WL 268801, at *8 (E.D.N.Y. Jan. 30, 2008) ("[A plaintiff] may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." (citations and internal quotation marks omitted)).  However, "[it] is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." *Grant v. Roche Diagnostics Corp.*, No. 09-CV-1540, 2011 WL 3040913, at *11 (E.D.N.Y. July 20, 2011) (quoting *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008)).

"In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the [employer's] explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147.  Where a plaintiff offers evidence of pretext, courts must take a "case-by-case approach" and examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves*, 530 U.S. at 143). Whether summary judgment is appropriate depends on "a number of factors," including "the strength of the plaintiff's prima facie case, the probative value

of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered" on a motion for summary judgment. *Reeves*, 530 U.S. at 148–49. As the Court in *Reeves* noted, even if "the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation," judgment as a matter of law may still be appropriate, where, for instance, "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* at 148.

Samuels must ultimately prove that her race was a motivating factor behind her termination. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015). The Court concludes that Samuels cannot show that the reasons proffered by Defendants for her termination were pretextual. Moreover, even assuming <u>arguendo</u>, that there is a factual dispute about pretext, no reasonable jury could conclude that this was a pretext for discrimination.

### 1. Pretext

As the recitation of the facts set out earlier makes clear, many of the incidents of deficient performance identified by Samuels' preceptors are undisputed. Samuels' attempts to excuse and justify these incidents are insufficient to establish pretext here. Samuels blames her inability to complete certain tasks in a timely manner on the numerous meetings Defendants held with her. (Samuels Dep. at 218:16–219:17.)

However, multiple preceptors reported issues with Samuels' performance and her inability to deal with the patient loads she was expected to manage at various points during her orientation period.

The evidence concerning the four incidents involving medication that were cited in her termination notice are particularly telling.  Samuels does not even dispute that the incident involving heart medication occurred on March 13, but instead blames this episode on Chevallier "sitting at the front desk having a party." (Samuels Dep. at 302:18–304:23.)  There is no testimony or affidavit from Samuels in which she disputes the account of the March 7 Lasix incident that is recounted in her termination notice.  In her March 16 call to Miller, Samuels offered a feeble excuse for this incident.  While Samuels disputed the March 3 incident involving Heparin at her deposition, the record indicates that, in her March 16 call to Miller, Samuels again proffered weak excuses for the Heparin incident and she has never disputed making those statements to Miller.  Moreover while Samuels testified, in conclusory fashion, that Chevallier lied about the Heparin incident and the March 4 incident involving lithium, Samuels has never articulated her allegedly contrary version of these two incidents.

Even assuming *arguendo* that Samuels' testimony about the incidents and conduct that her preceptors reported to Paniagua could create a factual dispute on the issue of pretext, no reasonable jury could ultimately find that Samuel's race was a motivating factor in her termination.

**2.  Plaintiff Cannot Establish her Race was a Motivating Factor in Her Termination**

Here, there is no evidence of any comments by Samuels' preceptors or superiors about her race.  Additionally, Samuels subverts her own argument that a racially discriminatory animus motivated her termination by volunteering two race-neutral reasons for her termination.  The first is a predisposition against maternity unit staff, the capacity in which Samuels worked before she became an RN:

> Q.   I am trying to understand from you what it is you said to them about why you felt you were being terminated.
>
> A.   I told them that – well, I was really focused on [Fiore-Lopez] because [Fiore-Lopez], the [Chief Nursing Officer] of the hospital, she never liked any of the staff on maternity because she felt like we didn't work harder than anybody else in the hospital.  She knew I came from maternity.  She knew I came from there.  I said to her, "You are picking on me because you know I came from maternity."

(Samuels Dep. 109:10–22.) The second is her communications with representatives of a union to which she did not belong:

> Q.   So, I'm sorry, during the meeting with Maureen Morris, [Miller], and [Fiore-Lopez], after they gave you the termination notice, you said you had been speaking with the vice president of [New York State Nurses Association] about how to deal with this; am I understanding you correctly?
>
> A.   Not with that situation, with everything that's been going on.  And I've also mentioned it <u>before to [Miller], and that was the reason the flag was put over my head.  A red flag was put on me once I mentioned that I had Tracy [Koziak] for support from the union then that was it.  It was all downhill from there.</u>  And I mentioned it again at that termination meeting, that that is one of reasons why they were doing this to me.

(*Id.* at 101:20–106:13 (emphasis added); *see, e.g.*, *id.* at 140:21–41:5.)  This testimony undercuts Samuels' claims that her termination was motivated by her race.

Samuels' primary argument in her opposition brief is that a jury could infer discriminatory intent because Defendants allegedly departed from their regular practices in handlings Samuels' complaints of mistreatment.  (Pl. Opp. at 15–18.)

Samuels contends that she complained of mistreatment and discrimination and that those complaints were not handled consistent with St. Charles's policies because they were not reported to human resources or investigated.  (Pl. 56.1 ¶ 43.) This argument is unpersuasive.  Samuels relies on the testimony of Fiore-Lopez about this purported policy.  However, Fiore-Lopez's testimony focused on the handling of discrimination complaints.   (Fiore-Lopez Dep. at 38–43.)   None of Samuels' complaints prior to March 16—when she was given her termination notice— concerned discrimination.  There is also no evidence that analogous complaints of mistreatment by similarly situated employees were differently.   Moreover, even assuming *arguendo* that Samuels' complaints of mistreatment were not handled in accordance with St. Charles' policies, that failure does not, given the entire record here, permit a jury to conclude that her termination was discriminatory. *See Tu Ying Chen v. Suffolk Cnty. Cmty. Coll.*, 734 F. App'x 773, 776 (2d Cir. 2018) ("Even if Defendants deviated procedurally in some way, none of those deviations reasonably affected their decision or raise the specter of a discriminatory pretext." (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 45 (2d Cir. 2000))).

Samuels also cites to Paniagua's handling of her complaint about Colluci.  (Pl. 56.1 ¶ 43.)  Samuels maintains that Paniagua should have reported this complaint to his superiors or human resources.  This argument is meritless.  Paniagua addressed

Samuels' complaint by giving her a different preceptor. Moreover, even if Paniagua's actions contradicted a policy or precedent at St. Charles, that does not suggest discrimination given the record here.

Samuels also makes various attempts to show that she was subjected to disparate treatment. None of these arguments suggest that her termination was motivated by her race.

To the extent Samuels contends her preceptors are similarly situated to her, an orientee, she is mistaken as a matter of law. *Johnson v. Schmid*, 750 Fed. App'x 12, 17 (2d Cir. 2018) (finding that, as a matter of law, social worker trainee was not similarly situated to his instructors). There is also no evidence that her preceptors engaged in comparable conduct. Chevallier admitted that: (1) in her lengthy nursing career, she had given, on at least one occasion, medication later than when it was supposed be given; and (2) she was not terminated or disciplined as a result. (Chevallier Dep. at 36:7-18.) This is patently insufficient to establish that Chevallier engaged in comparable misconduct. This testimony provides no detail about what medication was at issue, how late it was given, how many times this occurred, or any of the surrounding circumstances. By contrast, Samuels had multiple performance issues and her termination notice identified four instances where she failed to timely provide critical medications within a span of less than two weeks. At her deposition, Chevallier also answered "yes" when asked if she had "ever gotten [her] paperwork done late." (Chevallier Dep. at 40–41.) Chevallier explained that "[i]t depends upon the day" and admitted that she was not terminated or disciplined for late paperwork.

(*Id.*)  Similar to Chevallier's testimony about her administration of medication, there is no evidence concerning the nature or significance of this late paperwork, the circumstances of these incidents, or the frequency with which this occurred during Chevallier's lengthy nursing career.

Samuels also contends that she was treated differently, in various ways, than Allison Connell, a white orientee who worked on her floor during the same time period and passed her probationary period.[10]  Given that Connell was also an orientee in the same unit, Connell could potentially be an appropriate comparator.

However, Samuels did not observe Connell or any other "nurse orientees perform their functions or responsibilities."  (Def. 56.1 ¶ 52; Pl. 56.1 Resp. ¶ 52; Samuels Dep. at 307.)  Samuels has no evidence about the most critical comparison between her and Connell—namely, how Connell performed during the clinical component of her orientation period as she worked with patients and was supervised by her preceptor.  (*See* Samuels Dep. t 45:6–47:11 ("Q. Did you ever see [Connell] perform her responsibilities on the floor?  A. We were both working.  She was down this hallway, I was down this hallway.  I am with my preceptor, she is with hers.  I don't know what she was doing on that end of the hallway, no."); *id.* at 49:4–15 ("Q. Did you ever observe anyone giving [Connell] feedback or evaluation of her

---

[10]  Samuels also claims she was treated differently because Chevallier could not recall any other orientees being terminated at the conclusion of their probationary period.  (Chevallier Dep. at 31–32.)  Samuels, however, has not shown that any other orientees received reports of poor performance that were comparable to the reports that Paniagua received from multiple preceptors about Samuels.  (*See* Miller Decl. ¶ 6 ("None of [the other orientees] had a poor performance record remotely similar to Ms. Samuels' record . . . .").)  Moreover, Ann Marie Miller, who managed North and 3 East units, attested that she was responsible for terminating the employment of five registered nurses, including Samuels, who failed to pass her probationary period.  (Miller Decl. ¶ 7.)

performance of her responsibilities while in the clinical component of the orientation? A. No."); *id.* at 77:14–78:3 ("Q. And you didn't see how the nurses or any of the other staff treated [Connell], correct?  A. Right."); *id.* at 195 ("I don't know what they were doing with [Connell], so I have no idea.  I can't answer what they were doing with [Connell].  I can only answer for me . . . ."); *id.* at 307:8–12 ("Q. But you don't know and you didn't observe how [Connell] did during her introductory period, correct?  A. No.  I am not around her when she had a preceptor.").)

Samuels' reliance on Connell fails because she does not have evidence that Connell engaged in conduct of "comparable seriousness." *See Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (quoting *McDonnell Douglas*, 411 U.S. at 804); *Toussaint v. NY Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 216 (S.D.N.Y.) (co-worker not comparable where "[p]laintiff's disciplinary history [was] not only voluminous, it also relates to the precise conduct for which he was ultimately terminated"), *aff'd*, 706 Fed. App'x 44 (2d Cir. 2017); *Tomasino v. Mount Sinai Med. Ctr. & Hosp.*, 2003 WL 1193726, at *14 (S.D.N.Y. Mar. 13, 2003) (finding comparators not similarly-situated in all material respects because "[n]one . . . committed the most serious of the infractions for which [plaintiff] was discharged . . . .").

Nevertheless, Samuels insists that she was treated differently than Connell in certain other ways and that this purported disparate treatment raises an inference

of race discrimination here.[11]

First, Samuels relies on her limited observations of Chevallier's interactions with Connell at the nursing station. Specifically, Samuels testified that, at the nursing station, Chevallier was always "sweet" with Connell, never yelled at Connell, and never spoke to Connell the way she spoke to Samuels. (Samuels Dep. at 308). According to Samuels, while Chevallier always talked softly to Connell at the nursing station, Chevallier was always "yelling and barking" at Samuels. (_Id._ at 310). These are the only instances where Samuels observed Chevallier interact with Connell.[12]

This evidence of purported disparate treatment is insufficient to permit a jury to infer that Chevallier acted with discriminatory intent or that Samuels' race was a motivating factor in her termination. Samuels' observations of these limited interactions between Chevallier and Connell are simply too meager to suggest that Chevallier acted with discriminatory intent. This evidence is, at best, analogous to the evidence of alleged disparate treatment proffered by the plaintiff in _Zoll v. Northwell Health, Inc.,_ which both this Court and the Second Circuit found insufficient to suggest discrimination. In _Zoll_, the plaintiff attested, inter alia, that

---

[11] Samuels also claims that she was treated differently than Heather Axelson, another white orientee on her floor. However, there is little, if any, evidence about Axelson or any other orientees in the record. At one point, Samuels testified that she began her orientation with two nurses, Connell and another nurse whose name Samuels could not recall. (Samuels Dep. at 46.) There is no other evidence about this other orientee. Samuels also testified that another white orientee began her orientation only one week before Samuels' employment ended in March 2017. (Samuels Dep. at 307–08.) Samuels, however, did not observe this new orientee being supervised during her orientation period and Samuel's papers do not cite to any evidence concerning how this orientee was treated. (_Id._ at 308; Pl. 56.1 ¶ 67.)

[12] Plaintiff also testified that Connell admitted that she was "never" yelled at by Chevallier. Samuels Dep. at 310. This statement, however, is inadmissible hearsay.

her supervisor: (1) denied her "meaningful supervision," despite meeting with non-Caucasian staff "with regularity"; and (2) was dismissive of the plaintiff in the workplace, failing to say hello or goodbye to the plaintiff, or engage in conversation. In granting summary judgment, this Court explained:

> Plaintiff . . . contends that she was treated differently in her day-to-day experience . . . compared to non-Caucasian employees—i.e., in contexts not directly related to the [reasons] that [defendant] maintains led to Plaintiff's termination. Although such instances of allegedly disparate treatment can be relevant, as circumstantial evidence, to ultimately show intentional discrimination, none of the remaining allegations of "disparate treatment" cited by Plaintiff could permit a reasonable jury to infer discrimination.

*Zoll v. Northwell Health, Inc.*, No. 16-CV-2063, 2019 WL 2295679, at *9 (E.D.N.Y. May 30, 2019), *aff'd*, 810 F. App'x 79, 80. That reasoning also applies here.

The evidence discussed above concerning alleged disparate treatment is also insufficient to suggest race discrimination because this evidence concerns only Chevallier, and multiple other preceptors also reported similar deficiencies in Samuels' performance. Samuels does not assert that these other preceptors yelled at her, but not Connell. Moreover, there is no evidence that Connell had a similar record of performance issues that were reported by multiple preceptors.

Samuels also argues that she was treated differently because she was consistently being pulled from the hospital floor into the meetings, away from her patients. This, however, is not evidence of disparate treatment. Samuels does not cite to any evidence addressing the frequency with which Connell had to meet with her preceptors and supervisors. Moreover, unlike Samuels, there is no evidence that Paniagua had received reports from multiple preceptors about Connell's poor

performance. Accordingly, Samuels has not shown that Connell was similarly situated or received preferential treatment.

Samuels also contends that she had to take care of eight or nine patients while Connell was given only four or five patients. However, Samuels cites only inadmissible hearsay in support of her claim that Connell was only given four or five patients. (Pl.'s 56.1 ¶ 67.) Specifically, Samuels testified that she had a conversation with Connell in which Connell admitted that she was only responsible for four or five patients. (Samuels Dep. at 309–10.) As this evidence is inadmissible, this argument fails.

Finally, Samuels claims she was subjected to disparate treatment because she was the target of false allegations and Connell was not. Specifically, Samuels contends that her preceptors falsely reported that she was only able to care for a limited number of patients when, in fact, she was taking care of more patients. In support of this argument, Samuels cites to the deposition testimony outlined below. (*See* Pl. 56.1 ¶ 67.)

At her deposition, Samuels was shown her orientation evaluation for the week of February 19, 2017. This document—which is not part of the summary judgment record before the Court—appears to show that Samuels was given a goal of managing five patients. (Samuels Dep. at 265, 281.) Samuels initially testified that this document was false because, in fact, she was already taking care of six or seven patients at the time and was, thus, already exceeding her goal. (Samuels Dep. at 267.) When Samuels completed her deposition on a subsequent day, she changed her

testimony and asserted that she was actually managing eight to nine patients at this time.  (Samuels Dep. at 278–81.)

Even assuming *arguendo* that a jury could find, based on this deposition testimony, that Chevallier inaccurately reported the number of the patients Samuels was *independently* managing, this evidence is insufficient to suggest that Chevallier acted with discriminatory intent or that Samuels' termination was motived by her race.  Samuels insists that this evidence is proof of disparate treatment because, according to Samuels, Chevallier never falsely reported the number of patients managed by Connell.[13]

Given the entire record here, a reasonable jury could not infer discriminatory intent based on this evidence.  In disparate treatment cases, courts typically look to whether the plaintiff and the comparator engaged in the same misconduct and were then treated differently.  Under Samuels' theory, plaintiffs would routinely survive summary judgment whenever they assert that a supervisor fabricated a false allegation against them, but did not also fabricate a false allegation against other employees outside their protected class.  Samuels cites no authority accepting this theory.  In any event, a reasonable jury could not infer discriminatory intent based on the specific evidence in the record here.

---

[13]  It does not appear that Connell was ever deposed and asked about the accuracy of her preceptors' reports about her patient load.  Samuels seems to imply that a jury could infer that Connell's patient load was never reported inaccurately because Connell ultimately passed her probation.  The Court does not agree that such an inference could be drawn by a jury given the record here.  In any event, even assuming *arguendo* that a jury could conclude that Chevallier always accurately reported Connell's patient load, Samuels' disparate treatment argument still fails.

Notably, three different preceptors—Chevallier, Colluci, and Gueli—all reported to Paniagua that Samuels was managing limited numbers of patients that were below the patient goals that had been set for her. This was an ongoing issue for Samuels. To the extent Samuels is asserting that her other preceptors also lied about her patient load, there is no evidence in the record about the other orientee who Colluci and Gueli supervised or about the accuracy of their reports concerning the patient loads of these orientees. As such, Samuels has not shown that Colluci and Gueli treated her differently than other similarly situated orientees. Moreover, Samuels was not terminated simply because of the number of patients that she was managing. She was terminated due to her poor performance in managing her patients, including the four specific incidents set out in her termination notice. As explained earlier, while Samuels attempts to dispute that some of these incidents occurred, her denials are conclusory and she largely offers excuses and rationalizations for these incidents and her other deficient performance.

Even when all of the evidence set out above is considered cumulatively, Samuels has not raised a genuine dispute of material fact on the ultimate question of whether her termination was motivated by her race. Defendants are granted summary judgment in their favor on Samuels' race discrimination claim.

## II.   Hostile Work Environment

"[A] hostile working environment is established under Section 1981 when the workplace is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment and create

an abusive working environment.'" *Wiggins v. Garden City Golf Club*, 2019 WL 6716750, at *4 (E.D.N.Y. Dec. 10, 2019) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).   To assess the situation, courts look at "the totality of the circumstances, in light of such factors as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir. 2004) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

Samuels premises her hostile work environment claim on the fact that, after "inform[ing] Defendants Miller and Fiore-Lopez of" Colucci and Chevallier's racially discriminatory treatment, "no corrective actions were ever taken" and there was "increased hostility and retaliation."  (Pl. Opp. at 14.)  By articulating her claim in this fashion, Samuels' untethers it from any reasonable view of the evidence.  It is undisputed that the only meeting at which Samuels alerted Defendants of alleged discrimination on the basis of race was Samuels' termination on March 17.  (Samuels Dep. at 68:22–72:3, 131:18–24 ("I said to them at the last meeting we had that I got treated the way I was treated because of the color of my skin.").)  As a consequence of "inform[ing]" Miller and Fiore-Lopez at that time, Samuels was not around to see whether "no corrective actions were taken" or to experience any allegedly "increased" hostility.  Her claims are conjecture and depends upon facts of which she has no personal knowledge.

In any event, § 1981 hostile work environment claims require "a plaintiff [to] establish that the defendants 'created such an environment because of the plaintiff's race.'" *Rubert v. King*, 2020 WL 5751513, at \*8 (S.D.N.Y. Sept. 25, 2020) (quoting *Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 224 (E.D.N.Y. 2018)). No such evidence exists in the record. Samuels repeatedly testified that no one made racially discriminatory comments, *e.g.*, Samuels Dep. at 65:24–66:21, and there is no evidence from which to draw a reasonable inference that the facially neutral conduct Samuels complains about here was due to her race as opposed to, say, incompatible personalities or Samuels' deficient and unsafe performance.

Defendants are granted summary judgment in their favor on the hostile work environment claims.

## III.  Retaliation

Section 1981 retaliation claims "are evaluated using a three-step burden-shifting analysis." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010). First, a plaintiff must establish a *prima facie* case of retaliation, *i.e.*, that (1) she engaged in protected activity under § 1981, (2) the employer was aware of this activity, (3) the employer took adverse action against the plaintiff, and (4) a causal connection—viz. a retaliatory motive—exists between the protected activity and the adverse action. *Id.* (quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205–06 (2d Cir. 2006)). Second, the employer "must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory." *Id.*

Third, "the plaintiff must show that retaliation was a substantial reason for the complained-of action." *Id.*

In a *prima facie* case for retaliation, "[t]he term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination," *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir.2000), *superseded on other grounds by* Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85, and the employer must have been aware the employee engaged in one. "[I]mplicit in [that] requirement . . . is the requirement that [the employer] understood, or could reasonably have understood, that the plaintiff's [protected activity] was directed at" statutorily prohibited conduct, *e.g.*, race discrimination. *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107–08 (2d Cir. 2011) (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.1998)). By way of example, the Second Circuit in *Jarrell v. Hospital for Special Care* affirmed a grant a summary judgment to a hospital employer where the former employee "offered no evidence" that his activity—a complaint to the Connecticut Department of Public Health—"allege[d] any discrimination premised on race." 626 Fed. App'x 308, 311 (2d Cir. 2015).

Samuels asserts that her protected activity was her "reporting discriminatory and differential treatment to Defendant[s] Miller and Fiore-Lopez." Pl. Opp. at 19–20. According to Samuels, "[o]nce these complaints were made to Defendants Miller and Fiore-Lopez (the protected activity), negative reports of [Samuels] began and she was subsequently terminated (adverse action suffered)." *Id.* This argument is out-of-sync with both the facts and the law. The only instance where Samuels made a

complaint about discriminatory treatment based on her race to Miller and Fiore-Lopez was at her termination hearing on March 16, 2017.[14]  (*E.g.*, Samuels Dep. at 68:22–72:3, 131:18–24 ("I said to them at the last meeting we had that I got treated the way I was treated because of the color of my skin.").)  The reports of Samuels' poor performance began as soon as Samuels started her clinical component in December 2016.  (*E.g.*, Paniagua Notes; *see* Paniagua Decl. ¶¶ 10–11; *see also* Dec. 21, 2016 Email; Performance Appraisal dated January 27, 2017; Miller Decl. ¶ 3.)  No causal connection arises here because Samuels only complained to Miller and Fiore-Lopez about race discrimination after Defendants had decided to terminate her.  Samuels made these complaints after Defendants had discussed, drafted, and presented Samuels with the detailed Termination Notice listing the bases for their decision. (Termination Not.; Samuels Dep. at 68:22–70:9, 96:24–102:11, 108:9–111:6; Fiore-Lopez Dep. at 102:16–103:9.)  This timing defeats her retaliatory termination claim.

Additionally, and as she did with respect to her race discrimination claim, Samuels undermines her retaliation claim by volunteering bases for Defendants' conduct that are unrelated to any protected activity.  She herself testified that the "retaliation that was against" her stemmed from her "mention[ing] the union and the union support" weeks prior to her termination.  (Samuels Dep. at 208:6–11.)

Samuels also appears to argue that, after she complained about race discrimination to Miller and Fiore-Lopez in her termination hearing, Defendants

---

[14] Samuels's statements about alleged discrimination during conversations she had with three CNAs are inapposite.  There is no evidence that any of those conversations were relayed to her preceptors or supervisors.

"continued [their] retaliation" against her by reporting her termination to the OPD. This theory, however, fails.  Samuels does not dispute that New York State Public Health Law § 2803-e(1)(a) requires hospitals to notify the OPD of any termination of a licensed professional relating to "incompetence, malpractice, or misconduct or impairment of patient safety or welfare."  As recounted in the Samuels' Termination Notice—which was drafted and distributed *before* Samuels complained to Defendants about race discrimination—Defendants found Samuels' performance "pose[d] a serious safety issue." (Termination Not.)  There is no evidence suggesting Defendants reported Samuels' termination to the OPD in retaliation for her complaints of discrimination.

Defendants are entitled to summary judgment on Samuel's retaliation cause of action.

## CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment is granted.  Samuels has failed to raise triable issues of fact on any of her three claims. The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York         **/s/ (JMA)**
      September 30, 2022          Joan  M. Azrack
                                        United States District Judge